Edward G. Baker, J.
Plaintiff, William C. Ash, individually and as president pro tem and Harry Martin, individually and as secretary-business manager of New York Association No. 88 of Masters and Mates of the International Organization of Masters, Mates and Pilots, Inc. (hereinafter referred to as the *530 Local) bring this action against the defendants, members of the Local, for injunctive relief and for damages.
In substance, the complaint alleges that the defendants, unlawfully and in violation of the provisions of its constitution and by-laws seized control of the Local, of its records and property, forcibly ousted its duly elected officials, prevented them from gaining access to the union offices and from performing their duties as officers, and undertook, unlawfully, to act in the capacity of officials pro tern.
The Local is a subordinate unit of International Organization of Masters, Mates and Pilots, Inc. Its membership consists of approximately 1,700 merchant marine officers of whom a vast majority, at any given time, are-at sea. To afford each of the members an opportunity to vote, sections 1 to 6 inclusive of article 3 of the constitution provide, inter alia, that nominations of officers be made quadrennially at the first meeting in September, the elections to take place at the second meeting in December. The by-laws provide for the mailing of ballots to all members within two weeks from the time nominations are made, for the return of the ballots in sealed envelopes, and for counting of ballots received by the election committee up to 2:00 p.m. on the day of election.
Pursuant to the provisions of said constitution and by-laws, an election was held during the period from September, 1956 to December, 1956. The following officers weré elected: Atkins, president; Shea, first vice-president; Gurnee, second vice-president; Martin, secretary-business manager; Pesco, Oliver and Barlow, trustees. These officials comprise the executive board or executive committee of the Local, and it is provided that four of them shall constitute a quorum. Section 4 of article 3 of the constitution provides, in part, “ If any vacancy occurs by death, resignation or otherwise, it shall be filled by the executive committee, pro tern, until such appointee be approved by the members, at first regular meeting thereafter.”
In October, 1956, Atkins and Barlow, each of whom acted in the capacity of job dispatcher for the union (their duties being to assign members to jobs in order of priority) were indicted for bribery in connection with the assignment of a union member to a job out of priority, a practice known in the trade as “ backdoor shipping ”. They were tried on the charge and convicted in the latter part of November, 1957, and were sentenced in January, 1958. Atkins, who had a criminal record, was sentenced to imprisonment; Barlow’s sentence was suspended. After their indictment and prior to their conviction, both continued to perform the duties of dispatcher for the union, with *531 the acquiescence of Martin and the other members of the executive board. Subsequent to his conviction and until March 7,1958, the date of his resignation, Barlow was permitted to and did, in fact, continue, from time to time, to dispatch men for jobs, this having been sanctioned, according to Martin, by the Assistant District Attorney and the Judge who presided at the trial.
From the outset, Martin believed that the accused officers were the victims of what he termed a “ frame-up ”. At a meeting of the executive board held November 21, 1957 attended by Atkins, Barlow, Martin, Shea and Gurnee, a resolution was passed (Atkins and Barlow not voting) that the Local defray the expenses of their appeal from their convictions. At the regular meeting of the membership held on November 27, 1957, 143 members being present, the aforesaid resolution was read and the executive board’s action was approved, unanimously. To the time of his sentence, Atkins continued to preside at regular meetings of the Local.
Shortly prior to the regular membership meeting of February 26, 1958, the executive board met at the call of Martin. There were present at this meeting Martin, Shea, Gurnee and Fesco. At the time, Atkins was in prison, or so it was assumed, by those present. The minutes of the meeting were recorded by Martin who wrote: discussed appointing Pres. Pro. Tern while Pres. Atkins was away. V. Westerling nominated by E. Gurney. No second. Wm. Ash nom. by H. Martin, seconded M. 0. F. (Fesco). Vote 3 to 1. Ash.” Martin and the other members of the executive board obviously had agreed that, upon his release from prison, Atkins was to continue in office as president of the Local and that in the meanwhile and pending such release, Ash was to serve as president pro tern. This conclusion is supported by the minutes of the regular meeting of the members held in the afternoon of the same day which state, inter alia: “ Secretary Martin reported that he had received a telephone call informing him that President Atkins would be released on bail and that the International Organization’s attorney had stated that he could return to his position as President of Local 88.” No mention was made at the regular meeting of the membership of the executive board’s appointment of Ash; and, of course, in view of the position of Martin and the other members of the board with respect to Atkins resuming his duties as president, it was unnecessary that the appointment be approved.
Between February 26 and March 6 there occurred, in Martin and the other members of the executive board, a change of mind. Whatever the cause of this, it is reasonable to infer that Martin had heard rumblings of discontent among the members with *532 respect to Ms support of the convicted officials. There was “ thunder on the left ” and he prepared to meet the anticipated storm. On the last-mentioned date, Martin, Atkins and Lurvey met at the office of Mr. Schwartz, the attorney for the International Martin and Atkins signed the following resolution, which later was signed by Shea, Gurnee and Fesco:
WHEREAS, the International Executive Committee has unanimously voted to conduct an investigation into the hooks and affairs of Local 88; and
WHEREAS, the undersigned officers of Local 88 are of the firm opinion that the books and affairs of Local 88 are in accord with the finest trade union principles; and WHEREAS, the undersigned officers of Local 88 desire that the trade union reputation of Local 88 be maintained beyond reproach; and
WHEREAS, the undersigned officers of Local 88 are of the opinion that the best way to demonstrate their confidence in the integrity of the books and affairs of Local 88 is to consent to a Trustee being appointed, provided that they were assured of the impartiality of said Trustee;
THEREFORE,- BE IT RESOLVED that the undersigned officers of Local 88 acting with full authority for and on behalf of the membership of Local 88, and upon the express condition that Captain Roy L. Lurvey will be appointed as Trustee, hereby agree as follows:
1) That all procedural and substative requirements in connection with hearings or any other requirements of the International Constitution which would otherwise precede the appointment of a Trustee are expressly waived.
2) That the authority of Captain Roy L. Lurvey as Trustee shall be in accordance with Article 13, Section 8, of the International Constitution.
It seems clear that none of the signers of tMs resolution contemplated a trusteeship in the true sense. The credible evidence compels the conclusion that it had been agreed among the signers or some of them that Lurvey was to be trustee in name only, and that the local officials were to continue in actual control. Support for this conclusion is found in the undisputed fact that, as late as January 30, at a meeting of the International executive committee, Martin had strenuously opposed the appointment of a trustee in advance of proper investigation.
Concededly, the procedural and substantive requirements specified in section 8 of article 13 of the constitution of the International relating to the appointment of a trustee for a Local were not complied with. The resolution itself recites that these were waived. However, we are not here concerned with the question of the validity of the waiver or of the appoint *533 ment, or of the right of the trustee to assume control of the affairs of the Local. The point made by the defendants is that this surrender, or attempted surrender of local autonomy without consent of the membership was a violation of trust by the officials concerned, sufficient, in and of itself, under the “ clean hands ” doctrine, to bar the relief sought in this action.
Immediately after the signing of the quoted resolution, Atkins submitted his resignation. This was followed by the resignation of Barlow which was submitted on March 7, 1958.
On March 10, 1958, the executive board met. Present were Shea, Gurnee, Martin and Pesco. The minutes of this meeting recite that Ash and one Anderson were unanimously designated president pro tern and trustee pro tern, respectively, to fill the vacancies created by the aforesaid resignations. Gurnee disputed this, claiming that the vote was not unanimous, he having voted for Wester ling for president pro tern. The issue is unimportant. Whether unanimously or by majority vote, Ash and Anderson were lawfully designated as temporary officials in accordance with the procedure provided in section 4 of article 3 of the constitution of the Local.
On March 12,1958, the regular meeting of the membership was held, Ash presiding. After the customary moment of silence for departed members, bedlam ensued. Ash’s right to preside was challenged by several members. He stated that he had been designated president pro tern by the executive board. There were shouts, protests, confusion and general disorder — as to this, all witnesses were in substantial agreement. As to what occurred thereafter, there is sharp dispute. Plaintiffs maintain that Ash was forcibly removed from the rostrum; that he returned, sought to restore some semblance of order, and, failing in this, declared the meeting recessed and left the room with Martin. Defendants insist that immediately after Ash’s statement of his selection by the executive board, a motion was made that Ash be rejected as president pro tern; that there were several seconds to the motion which was carried overwhelmingly by a rising vote of the membership; that Ash then was ‘ ‘ assisted ” from the rostrum; that Boring took over as temporary chairman, Gurnee having been requested to preside but-having refused upon the ground that the vote rejecting Ash had not been in accordance with rules of order.
Whatever the true facts, it is clear that during this stage of the meeting there was confusion and disorder amounting to bedlam. At some point, Ash, Martin and the other officers left the room retreating to the union offices below. Emissaries *534 requested them to return. They refused. The meeting continued with Holdeman presiding as chairman, he having been selected by majority vote of the members remaining after Ash and the others left. The body then voted to suspend the incumbent officers pending trial on charges which had been read by Polichek. A full slate of officials then was elected to fill the places of those suspended, pending election of new officials in the immediate future. After certain other matters had been discussed and disposed of, the meeting was adjourned. Holdeman, Boring and others proceeded to the union offices and there informed Ash and G-urnee of the action taken at the meeting. They then took possession of the union offices and of the books and records. Access thereto has since been denied the regularly elected officials.
It is clear that the coup had been planned. On the evening preceding the meeting, and again about an hour before it was called to order, a number of members, including those subsequently elected temporary officers, met at the office of the attorneys who represented them at the trial. Whether or not the persons attending these preliminary meetings were aware of Ash’s appointment as president pro tern or knew of the resignation of Atkins and Barlow, it is obvious that the ouster of the incumbent officials, the selection of Holdeman and others to fill their places and the strategy to be followed at the meeting for the accomplishment of these ends, were discussed and agreed upon.
The credible evidence does not warrant the conclusion that the appointments of Ash and Anderson were rejected legally and in accordance with accepted rules of order. Unquestionably, the defendants and their followers had the voting strength to do this and would have done so had the question been properly presented. Having in mind the long smoldering resentment of many of the members toward the incumbent officers and the fact that the membership is composed of seamen, it was not to be expected that the meeting would proceed with the restraint and dignity of a meeting of the “ Ladies’ Aid Society ”. But, on the proof before the court, it cannot be said that, upon the question of .confirmation or rejection of the designated officials, there was a lawful or proper vote of the membership. The motion was “ railroaded ” through at a time when there was bedlam in the room. In the circumstances, Ash had the lawful right to declare the meeting in recess (see Robert’s Rules of Order Revised [75th Anniv. ed.], art. X, § 58). This he did, and his declaration was effective to suspend the meeting.
*535 It follows that the actions subsequently taken by those who remained in attendance at the meeting were, for this reason alone, void and of no effect. But even if it be assumed that Ash was validly rejected and that the meeting was properly continued, there was no authority whatever in the body for the suspension of the incumbent officers and the election of others to fill their places. It has been held that ‘ ‘ The constitution and by-laws of an unincorporated association express the terms of a contract which define the privileges secured and the duties assumed by those who have become members.” (Polin v. Kaplan, 257 N. Y. 277, 281.) The constitution and by-laws of Local 88 contain no provision for the summary suspension of officers or members without trial. On the contrary, sections 1 through 12 of article 9 of the constitution provide a detailed procedure for the trial of members accused of misconduct. Sections 2, 3, 4 and 6 thereof provide for complaints to be submitted in writing signed by the complainant; for referral of the charges to a trial committee of seven who are to be elected by the membership; for trial of the accused after due notice; etc. Section 4 provides, inter alia, that “ If an accused member is present at regular meeting when charges are preferred, the meeting may resolve itself into a committee of the whole and try the accused immediately.” There was, however, no proper presentation of charges against the incumbents and concededly, there was no trial. The attempted suspensions were unauthorized by any provision of the Local’s constitution and by-laws and were void and of no effect, as were the ‘ ‘ elections ’ ’ of the temporary officers.
Defendants challenge plaintiffs’ right to relief upon the ground that there has been no showing of irreparable damage. They point out that Martin’s salary was continued pending his trial. A ready answer for this contention may be found in the opinion of the court in Bianco v. Eisen (190 Misc. 609). In passing on the sufficiency of a complaint in an action brought by a union official to compel his restoration to office as a member of the executive board in the union, from which he claimed to have been unlawfully removed, Mr. Justice Null wrote (p. 610):
“ The right of the plaintiff to maintain this action * * * is challenged upon the ground that his grievance is unrelated to a threatened or actual pecuniary loss, such as the impairment of the right to work, loss of salary and the like. It is urged that plaintiff’s suspension from office, although alleged to have been wrongfully accomplished, fails to constitute the deprivation of a property right, which alone would permit the court to assume jurisdiction. * * * It is the nature of the office rather than *536 its perquisites which give it substance. * * * The unimpeded exercise of the functions of elective office, such as membership on the executive board of a labor union, is a right so fundamental as to be deemed the equivalent of a property right. ’ ’
But aside from the right of Martin and the other officials, as individuals, to continue in office until the expiration of their respective terms or until their prior lawful removal, there is the more important right of the 1,700 members of this Local to strict adherence to constitutional provisions in relation to the election and removal of their officials. It should be borne in mind that less than 10% of the total membership remained at the March 12 meeting after the exodus of Ash, Martin and their adherents. Sufficient was shown here to justify the intervention of a court of equity. (See Dusing v. Nuzzo, 177 Misc. 35.) Resort by plaintiffs to internal union processes would have been futile.
Whether Martin and the other elected officials violated their trusts by permitting the continuance in office of Atkins and Barlow after their convictions; by participating in or failing to detect the practice of “ back-door shipping by attempting to surrender local autonomy in consenting to the appointment of a trustee j by the expenditure of union funds for the prosecution of appeals by the convicted officials; and in other respects failed to discharge their official duties are matters which may properly be disposed of by the membership of the union within the framework of their constitution and by-laws. As Mr. Justice Beenneb wrote in his opinion on the motion by plaintiffs for a temporary injunction (13 Misc 2d 411): “If the incumbent plaintiffs and those duly elected are indeed the miscreants and derelicts to duty and trust that they are charged with being, then the defendants and their insurgent followers should prove these charges in a law abiding manner and [the .officials] be supplanted only as provided by the rules under which this union exists. If unionism is to be made clean and fresh, in keeping with the enlightened will of the top AFL-OIO leadership, it is important that the cleansing methods used to remove corruption and gangsterism, where they actually do exist, be free of the very evils sought to be eradicated. ’ ’ The suspicion of wrongdoing by the elected officials, however well founded, was no justification for their summary suspension without trial, for the seizure of plant and properties of the union, or for the election of ‘ ‘ temporary ’ ’ officials not provided for by its constitution.
The judgment to be entered herein will direct that the meeting of March 12, which, as has been stated above, was properly *537 recessed by the chair, continue on a date to be fixed in said judgment. In the event of the rejection of Ash and Anderson by proper vote, the executive board may proceed in accordance with the provisions of the constitution to appoint others to fill the vacant offices pending their approval by the membership. The court rejects the contention that the executive board is powerless to act by reason of the absence of a quorum. It is true that Oliver was in arrears of dues and, under the provisions of section 3(c) of article IV of the International constitution, he stood suspended. Moreover, his appointment as trustee pro tern was never submitted to the membership for approval pursuant to section 4 of article 3 of the Local’s constitution. However, Fesco’s resignation was withdrawn prior to its acceptance, and Gurnee’s never was submitted to any union official authorized to receive or to accept it. Neither resignation ever became effective and both these parties remain officials of the union. But if either or both resign or refuse to act, the membership may, at any regularly called meeting select others to fill their places. The constitution and by-laws of the union make no provision for the contingency suggested. However, in the absence of such provision, there is inherent in the membership the right and power to take whatever action may be necessary for the preservation of their existence as an association.
There remains to be considered the position of Boy Lurvey, as International trustee, etc., who was joined as a party to the action by order of Mr. Justice Brenner dated March 26, 1958. (13 Misc 2d 411, supra.) The order did not specify whether he was to be joined as a party plaintiff or party defendant. He was included as a party plaintiff, and the caption or title of the action was thereafter amended by order of the Appellate Division to name him simply as an “ Added Party.” (See 5 A D 2d 1017.)
Lurvey took no part in the trial of this action. He refused to assume and could not be required to assume the position of a party plaintiff (39 Am. Jur., Parties, § 93). Neither in the complaint nor answer was any relief sought against him, and neither plaintiffs nor defendants were willing to amend their respective pleadings to seek any such relief.
The evidence in this action indicates that on March 21, 1958 the secretary-treasurer of the International by letter notified Gurnee that Lurvey had been appointed trustee ‘ ‘ to take charge of and manage the affairs of Local 88,” and directed that property of the Local in his possession be turned over to said trustee. Thereafter Lurvey established offices and took over the union’s *538 function of dispatching men for jobs. He has made no effort to obtain possession or control of the Local’s plant, books and records.
It is unnecessary that the court speculate as to the effect upon Lurvey, as trustee, of the judgment to be entered herein. Since no relief has been sought in this action either by or against him, the judgment will direct that he be stricken as a party.
The foregoing constitutes the decision of the court in accordance with section 440 of the Civil Practice Act.
Judgment will be directed for plaintiffs as follows:
1) Enjoining and restraining the defendants and each of them, their agents, employees and representatives from interfering with the possession of the duly elected officials of Local 88 of the offices, books, records and other paraphernalia of the said Local and from preventing said officers from obtaining possession of- said properties and carrying out their duties as such officers, and
2) Enjoining and restraining said defendants and each of them, their agents, employees and representatives from using, transferring, paying out, distributing or disposing of any part of the funds, assets and other properties and the evidence thereof in defendants’ possession or control belonging to said organization; holding and using the office, office equipment, files, membership lists, records, books, documents, papers, bank statements, savings bank passbooks, and any and all other books, property of the said organization; representing to the members of the aforesaid organization, to the defendants, and to the public generally and others, that the individual defendants are officers and members of the executive board of the said organization; and from collecting dues from members of the said organization.
3) Directing that said defendants, their agents, employees and representatives, servants and attorneys render a full and complete accounting to the plaintiffs of all moneys and other properties received and disbursed or disposed of by them and of the location and value of all the funds, assets, accounts, books, records, office equipment, files, membership lists, savings bank passbooks and all other property of the plaintiffs so held by the said defendants; to transfer, pay over and deliver all of the aforesaid properties to the secretary-business manager of “88”.
Settle judgment on notice.